1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                                 SAN JOSE DIVISION

11

12    JOHN A. NKWUO,                          Case No.  5:14-cv-05192-HRL

            Plaintiff,
13                                            **ORDER GRANTING DEFENDANTS'**
      v.                                      **MOTION FOR SUMMARY JUDGMENT**
14
                                              Re: Dkt. No. 28
15    GOLDEN GATE UNIVERSITY, DAN
      ANGEL, NABIL RAGAE, PAUL FOUTS,
16    KERRY CURTIS, LEE ROBINS, ROBERT
      FURKERTH, DOES 1 through 10, inclusive,
17
            Defendants.
18
              Pro se plaintiff John Nkwuo is an engineer who was enrolled in a doctoral program at

19    Golden Gate University's Ageno School of Business.  According to defendants, Nkwuo was

20    dismissed from the program because he failed to pass a mandatory qualifying exam.  Nkwuo, on

21    the other hand, believes he passed.  He claims that defendants failed him because he holds

22    different political views than his professors and because of his race and national origin.  (He is an

23    African-American who immigrated to the United States from Nigeria.)  Additionally, plaintiff

24    claims that he suffered discrimination when one professor "verbally attacked" him for being late to

25    class (plaintiff claims he was on time) and had him administratively withdrawn from a course

26    (plaintiff says, for no good reason).  He also alleges that after he was dismissed, and without his

27    permission, defendants accessed and used a market forecast software program that he developed

28

United States District Court
Northern District of California

for his dissertation.

Nkwuo's complaint lists or identifies the following claims for relief:  breach of contract; breach of the covenant of good faith and fair dealing; plagiarism; harassment; discrimination; abuse of power and authority; hostile environment; "desparate" impact;[1] violation of Fourth Amendment rights; fraud; theft; conversion; and intentional infliction of emotional distress.

Now before the court is defendants' motion for summary judgment.  Plaintiff opposes the motion.  Upon consideration of the moving and responding papers, as well as the arguments presented at the motion hearing, this court grants the motion.[2]

## BACKGROUND

Unless otherwise noted, the following background facts, drawn from defendants' submissions,[3] are largely undisputed.

Golden Gate University (University) is a private, not-for-profit, institution of higher education in San Francisco, California.  (Fouts Decl. ¶ 5).  The University confers undergraduate, graduate, and professional degrees in a number of disciplines.  Relevant to Nkwuo's claims is the Doctor of Business Administration Program ("the DBA Program") offered by the University's Ageno School of Business.  According to defendants, the DBA Program is a professional practice doctoral degree program, which requires high-quality scholarly written work, if a student is to succeed.  (Fouts Decl., ¶9; Rageh Decl., ¶8; Curtis Decl., ¶4; Fulkerth Decl., ¶4; Robbins Decl., ¶4).

Nkwuo was admitted to the DBA Program, and he enrolled in August 2010.

**DBA Program Qualifying Examination**

Matriculation in the DBA Program is subject to the policies and procedures stated in the

---

[1] Presumably, plaintiff meant to refer here to a claim for "disparate impact."

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

[3] At the motion hearing, the court noted that plaintiff did not present any evidence, not even a declaration, in support of his opposition.  Plaintiff responded that most of defendants' evidence would have been part of his own submissions.  And, when asked, plaintiff did not identify for the court any documents he wanted the court to review, other than what defendants had already submitted in support of their motion.

United States District Court
Northern District of California

Doctor of Business Administration Policy and Procedures Manual ("the DBA Manual").  The

DBA Manual states:

> The DBA Program Committee establishes the academic policies and standards, specific to the DBA Program, which is a faculty committee of the School of Business, but may have one or more members from other schools of the University.  The Committee's areas of authority include the establishment of standards, policies and procedures on students' academic progress, including the qualifying and field examinations and dissertations; oversight of the doctoral examinations; approval of individual Dissertation Proposals and Committees.  The Committee is also responsible for formulating DBA admissions policies and standards, and changes to the DBA curriculum.  Consistent with other academic programs changes to the DBA curriculum and to admissions policies and standards are reviewed by the University's Committee on Academic Standards.

(Fouts Decl., ¶¶ 11-12; Rageh Decl., ¶¶ 10-11; Curtis Decl., ¶¶ 6-7; Fulkerth Decl., ¶¶ 6-7;

Robbins Decl., ¶¶ 6-7; Hoppes Decl., ¶¶ 8-9; Ex. A at 2).

After completing certain coursework (known as the "Foundation Curriculum"), DBA

students are required to pass a qualifying examination.  Students who fail that exam are allowed

only one retake; and, failing the examination a second time will result in automatic

disqualification from the DBA program.  As stated in the DBA Manual:

> After the Foundation Curriculum course work is completed, a comprehensive qualifying examination is required.  This examination will test the student's mastery of skills and disciplines of doctoral scholarship.  The examination consists of two three-hour written examination sessions and is offered two times per academic year in the fall and spring trimesters.  Students wishing to take the qualifying examination should register with the DBA Program Coordinator at least two months in advance of the announced schedule.  In preparing for the examination, students are encouraged to attempt old qualifying examinations and seek advice from appropriate doctoral faculty members.  ***Students who do not pass the qualifying examination the first time are allowed only one retake.  Failing the second examination will result in automatic disqualification from the DBA program.***

(Fouts Decl., ¶15; Rageh Decl., ¶14; Curtis Decl., ¶10; Fulkerth Decl., ¶10; Robbins Decl., ¶9; Ex.

A at 6) (emphasis added).

Each student's response on the qualifying examination is graded anonymously by at least

two members of the faculty.  Each student who takes the exam is assigned an identification

number before the examination, and that number is the sole piece of identifying information on the

students' exam responses.  The DBA Program faculty members who grade the exams do not know

3

the numbers assigned to each DBA Program student.  Those faculty members can only learn the students' identities after the exam grades have been submitted by those faculty members and finalized by the registrar.  (Fouts Decl., ¶18; Rageh Decl., ¶17; Curtis Decl., ¶13; Fulkerth Decl., ¶13; Robbins Decl., ¶12).  The DBA Manual states:

> e.4. Grading
>
> Each question of the qualifying . . . examinations will be read and graded by two members of the Golden Gate University faculty.  Students' written work will be identified only by their assigned numbers.  The grading will be based on the three factors listed above, with additional attention paid to cogency of writing and organization.

(Fouts Decl., ¶19; Rageh Decl., ¶18; Curtis Decl., ¶14; Fulkerth Decl., ¶14; Robbins Decl., ¶13; Ex. A at 7).

Faculty who grade the exams do not prepare or use model responses and instead use their academic judgment to apply the DBA Manual's grading criteria.  Defendants say that this is because as doctoral candidates, students are required to demonstrate critical thinking and analysis when faced with a unique situation or problem.  Defendants claim that providing students with model examination responses would undermine this goal of the program.  (Rageh Decl., ¶26; Curtis Decl., ¶23; Fulkerth Decl., ¶30; Robbins Decl., ¶30).  As stated in the DBA Manual :

> e. Examinations
>
> The general purpose of the Qualifying . . . Examinations is to evaluate the student's knowledge and acquired skills from both scholarly and applied points of view and his or her ability to apply that knowledge and skills in a real-world setting.  The examinations will be designed to test a level of scholarship which is consistent with both the accepted research standards of doctoral business scholarship of major American Universities and the practitioner orientation of Golden Gate University.
>
> In their response to the questions asked in these examinations, students will be required to demonstrate knowledge of:
>
> - The principal theories, concepts, and principles in the field,
>
> - The seminal literature and other important scholarly and practitioner literature in the field, and
>
> - How the theories, concepts, and principles of the field apply to business practice in general and to particular contemporary cases.

(Rageh Decl., ¶28; Curtis Decl., ¶26; Fulkerth Decl., ¶33; Robbins Decl., ¶32; Ex. A at 6).

United States District Court
Northern District of California

4

United States District Court
Northern District of California

**Plaintiff's Qualifying Examinations**

Nkwuo took the Qualifying Exam in April 2011 and again in April 2013,[4] the latter exam being the one retake permitted under the DBA Program policies.

Plaintiff's exam responses were graded by the same three DBA Program faculty members: Robert Fulkerth, Kerry Curtis, and Lee Robbins. Defendants say that both times Nkuwo sat for the exam, he failed to achieve a passing grade. (Fouts Decl., ¶24; Rageh Decl., ¶23; Curtis Decl., ¶¶16 and 20; Fulkerth Decl., ¶¶19 and 23; Robbins Decl., ¶¶14 and 21).

Defendants maintain that the students' qualifying examination responses in both Spring 2011 and Spring 2013, including plaintiff's, were submitted anonymously, identified only by an identification number assigned to the students. Because the examination responses were graded anonymously, defendants say that a student's personal identifying information---including race, color, and national origin---was not known to Professors Fulkerth, Curtis, or Robbins when they reviewed and graded the exams. (Curtis Decl., ¶¶ 17, 19; Fulkerth Decl., ¶¶ 20, 22; Robbins Decl., ¶¶ 15, 17). Plaintiff has presented no evidence to the contrary.

Professors Fulkerth, Curtis, and Robbins maintain that Nkuwo's exam responses (which they say they learned were submitted by him only after grading was completed) did not demonstrate the requisite skill and knowledge identified in the DBA Manual. (Curtis Decl., ¶18; Fulkerth Decl., ¶21; Robbins Decl., ¶16; Ex. A at 6). For example, they say that his exam responses did not demonstrate the critical thinking and analysis that is expected of a doctoral student, and did not show that he had the ability to conduct reasonable research. Further, they claim that clarity is an important part of both doing and presenting research; but, plaintiff's answers were unclear, such that the evaluating professors could not determine what his answers meant. (Fulkerth Decl., ¶¶ 26-27; Robbins Decl., ¶¶ 24-29).

---

[4] Nkwuo registered to retake the exam in October 2012. However, defendants say that, pursuant to standard practice, the DBA Program Committee cancelled the October 2012 qualifying exam because plaintiff was the only student who registered. (Fouts Decl. ¶ 31; Rageh Decl. ¶ 36). According to defendants, to ensure the anonymity of the grading process, the exam is cancelled whenever only one student registers to take it. Defendants say that the decision to cancel the October 2012 qualifying exam was based solely on academic consideration and had nothing to do with plaintiff's race, color, or national origin. (Fouts Decl. ¶ 32; Rageh Decl. ¶ 37). Plaintiff has presented no evidence to the contrary.

1    As will be discussed more fully below, plaintiff believes that he passed the exam and that

2    his failing grades could only have been the result of unlawful discrimination.

3    After receiving a failing grade on the second qualifying exam, plaintiff was subject to

4    automatic dismissal from the DBA Program as provided in the DBA Manual.  However, Dr. Nabil

5    Rageh (DBA Program Director), with the approval of the DBA Faculty Program Committee,

6    provided Nkwuo with an additional (third) opportunity to pass by taking an oral examination in

7    June 2013, with the oral examination conducted by Professors Fulkerth, Curtis, and Robbins.

8    (Fouts Decl., ¶27; Rageh Decl., ¶29; Curtis Decl., ¶¶ 29, 31; Fulkerth Decl., ¶¶ 35-36; Robbins

9    Decl., ¶¶ 35-36).

10    Although the DBA Manual does not provide for a third try at the qualifying examination,

11    defendants say it is not unprecedented.  They claim that since the Spring 2010 semester, three

12    DBA Program students, including plaintiff, have twice failed the written qualifying examination.

13    And, each of those three students, including plaintiff, were permitted to take an oral examination

14    as a third opportunity to pass.  (Fouts Decl., ¶28; Rageh Decl., ¶30).

15    Once again, defendants say that based on the academic judgment of the three faculty

16    members who conducted the oral examination, plaintiff did not demonstrate sufficient competency

17    at his oral examination to be given a passing grade.  (Fouts Decl., ¶29; Curtis Decl., ¶29; Fulkerth

18    Decl., ¶36; Robbins Decl., ¶36).[5]  And, on June 12, 2013, Dr. Rageh informed Nkwuo that,

19    because he did not pass the qualifying examination in the three attempts he was given, he was

20    disqualified from the DBA Program.  (Fouts Decl., ¶30; Rageh Decl., ¶32, Ex. E).

21    **Post-Qualifying Exam Meetings**

22    Plaintiff argues that faculty did not identify his shortcomings or provide the grading

23    criteria they used in evaluating his exam.  (Opp. at 6).  For their part, defendants point out that, in

24    deposition, plaintiff testified that he did meet with faculty; and, while he could not remember

25    exactly what they said, he recalled that they told him that one way to improve was to use a more

26

27    [5] Dr. Rageh avers that she was present at Nkwuo's oral exam and that she thought he did not
perform well.  (Rageh Decl. ¶ 31).  In his opposition, plaintiff says that Rageh was not there.

28    (Opp. at 21).  However, whether or not Rageh was at the oral exam does not create a genuine issue
of material fact precluding summary judgment.

qualitative (rather than quantitative) approach and to show that he had mastered research methods. (Vartain Decl., Exs. O, P, (Nkwuo Depo. 72:9- 73:24, 111:19-25, 227:5-14, 238:20-23, 240:11-15, 240:22-241:2, 279:13-280:14)). Additionally, the professors told him that the exam was evaluated subjectively. (Id., Ex. P (Nkwuo Depo. 243:13-19)). According to defendants, plaintiff took their advice in preparing to re-take the exam. (Id., (Nkwuo Depo. 74:22-25, 75:23-76:3, 76:23-77:2, 85:9-13, 279:13-280:14, 285:7-12, 286:13-289:3, 290:2-13)). Plaintiff also testified that after these meetings with the professors, he did not ask to further meet with them for more mentoring, before he retook the second qualifying exam. (Id., Ex. O (Nkwuo Depo. 87:13-17)).

Defendants contend that faculty members never declined to attend any meeting or phone conference with plaintiff to discuss the subject of his written qualifying examination deficiencies. (Rageh Decl., ¶48; Curtis Decl., ¶37; Fulkerth Decl., ¶42; Robbins Decl., ¶37). Additionally, defendants claim that the faculty never failed to honestly answer any question from plaintiff that concerned his qualifying examination deficiencies or "held back" any such information from him. (Curtis Decl., ¶¶38-39; Fulkerth Decl., ¶¶43-44; Robbins Decl., ¶¶38-39).

### Plaintiff's Administrative Appeal

DBA Program students may appeal decisions re failure of the qualifying examination. The DBA Manual incorporates the University's General Student Grievance Procedure, a policy promulgated by the University and applicable to all University students. (Fouts Decl., ¶44; Rageh Decl., ¶39; Hoppes Decl., ¶11; Exs. A-B). The DBA Manual states:

> The appeal process for failed examinations is as follows: the student will ask, via the Director or Academic Coordinator, for their work to be re-evaluated. That reevaluation will be done by the same professors who did the initial grading, who have sole discretion as to revising their grades. Beyond that, the appeal process will follow the standard University Grade Grievance process. That policy calls for grade changes to be determined administratively only for procedural reasons. Changes for content reasons cannot be mandated administratively, but require the consent of the professor(s) who assigned the initial grade.

(Fouts Decl., ¶43; Rageh Decl., ¶38; Ex A at 7).

On June 25, 2013, plaintiff filed a grievance under the General Student Grievance Procedure with the Dean of Student Affairs of the University regarding the decision to dismiss him from the DBA Program and other matters pertaining to his matriculation in the DBA

United States District Court
Northern District of California

Program.  (Hoppes Decl., ¶¶ 13-14, Ex. F).

Dean Cherron Hoppes was appointed as the administrative/faculty reviewer for plaintiff's grievance.  (Hoppes Decl., ¶4).  Plaintiff was given an opportunity to submit his grievance and all supporting documents, and he subsequently confirmed that he had no further documents or evidence that he wished to submit.  (Hoppes Decl., ¶¶15-16).  On July 9, 2013, Hoppes emailed plaintiff to schedule a time to have a telephone conference with plaintiff with respect to his grievance.  (Hoppes Decl., ¶19 Ex. H).  The phone conference was scheduled for the very next day.

Hoppes avers that during the telephonic interview on July 10, 2013, she discussed with plaintiff the substantive elements of his grievance and stated that this was an opportunity for Nkwuo to present any additional information not contained in the supporting documents that he already provided.  Hoppes further states that plaintiff orally explained what he said were the key facts, but at no time informed Hoppes that he wished to meet with her in person.  (Hoppes Decl., ¶20).

After the conference call interview, Hoppes says that she reviewed all of the documents submitted by Nkwuo in support of his grievance and also interviewed Dr. Rageh, as well as DBA Program Coordinator Yvonne Hynes.  (Hoppes Decl., ¶21).  On July 31, 2013, Hoppes issued a Grievance Findings Report which she sent to Barbara Karlin (Vice President of Academic Affairs) and to plaintiff.  (Id., ¶22, Ex. I).  In that report, Hoppes affirmed the decision to dismiss plaintiff from the program:

> The DBA program followed its procedures as defined in its materials and provided Mr. Nkwuo an additional opportunity to demonstrate his knowledge of the key learning outcomes of the program. . . . The resulting dismissal as a result of outcome of all three exams should therefore stand.

(Hoppes Decl., ¶26, Ex. I).  Additionally, Hoppes found:  "The program was within its policies in providing feedback on the exam results and there is no substantive grievance on this issue."  (Id., ¶28, Ex. I).  Hoppes says that she did not consider plaintiff's race, color, national origin, or voting/political views in conducting her review of plaintiff's grievance or evaluating the merits of it.  (Id., ¶41).

As will be discussed more fully below, plaintiff contends that defendants did not follow proper grievance procedure because they did not conduct a face-to-face meeting about his complaints.

**Administrative Withdrawal from Professor Fouts' Course**

Plaintiff claims that he was unfairly kicked out of a course taught by defendant Professor Paul Fouts. According to defendants, plaintiff was withdrawn from the course because he failed to complete a mandatory assignment that all students were required to finish before the first class.

Several weeks before the course began, Fouts sent an email to all of his students that included a copy of the syllabus and a description of the first assignment to be completed by the first class session. All students were required to read a book (to be selected from a list Fouts provided) and to prepare a 2-page review and summary of it for distribution and discussion in class. That same email said: "A warning: This assignment is mandatory, and if you do not fulfill it, you will not be allowed to continue in the course." (Fouts Decl., ¶¶ 33-37, Ex. L).

Plaintiff received Fouts' email and sent him a reply, advising as to his book choice. (Fouts Decl., ¶¶ 38-39, Ex. M). Fouts attests that Nkwuo did not complete the assignment; and, for that reason and in accordance with Fouts' standard practice in such situations, Nkwuo was administratively withdrawn from the course. (Id. ¶¶ 40-42). Fouts further states that the decision to have plaintiff withdrawn from the course had nothing to do with plaintiff's race, color, or national origin. (Id. ¶ 42). Plaintiff argues that Fouts should not have kicked him out after only one day; and, Nkwuo feels that, in fairness, he should have been evaluated based on his performance over the entire course. Additionally, plaintiff says that he read the assigned book and gave a presentation on it in the first class. However, according to his own deposition testimony, plaintiff did not prepare the required 2-page written review/summary. (Vartain Decl., Exs. O, P (Nkwuo Depo. 139:7-13, 143:11-16, 145:4-13, 147:8-24, 148:11-17, 162:10-23, 213:3-7, 213:25-214:12)).

Plaintiff claims that Fouts also "verbally attacked" him for being late on the first day of class. Plaintiff claims that he was not late. However, according to Nkwuo's own deposition testimony, the situation unfolded as follows: Plaintiff arrived at the classroom about 30 minutes

early, but the classroom door was locked and no one was there.  So, he went to the cafeteria to get something to eat, and returned to the classroom about 5 minutes after the class started.  Nkwuo acknowledged that Fouts did not say anything about his race and that he did not recall any of his professors ever saying anything about his race.  (Vartain Decl., Ex. O (Nkuwo Depo. 150:12-152:7, 153:18-22)).

### Plaintiff's Research Software

Plaintiff claims that defendants accessed and used a software program that he developed for his dissertation.  However, defendants aver that no defendant has used any portion of any research or academic work conducted or produced by plaintiff for their own personal gain, nor have they provided any such research or academic work to any third party for any purpose.  (Fouts Decl., ¶50; Rageh Decl., ¶46; Curtis Decl., ¶35; Fulkerth Decl., ¶40; Robbins Decl., ¶40; Hoppes Decl., ¶44).  Plaintiff has presented no evidence to the contrary.  And, he testified that he has no knowledge that the software has been accessed or used by any person at the University.  (Vartain Decl., Ex. O (Nkuwo Depo. 188:21-198:24)).

### The Project Management (Masters) Program

Plaintiff apparently also contends that he should have earned a masters degree in the University's M.S. in Project Systems Management program.  Defendants maintain that he was not enrolled in that program and that he did not complete the required coursework to earn that degree.  (Hoppes Decl. ¶¶ 36-37, Ex. I).  Plaintiff previously completed a master's program in the University's Information Technology Management (ITM) program in 2009; and, he evidently believed that 6 courses (18 units) previously applied to his ITM degree could be used by the University toward a masters degree in the Project and Systems Management program.  Defendants, however, say that the graduate policy for transfer of units from a previously completed master's program is limited to 12 units.  (Id., ¶39).  Plaintiff has presented no evidence to the contrary.  Additionally, plaintiff himself testified that he never completed the coursework required for the Project and Systems Management degree.  (Vartain Decl., Ex. P, (Nkuwo Depo. 352:3-13; 355:6-15)).

United States District Court
Northern District of California

**LEGAL STANDARD**

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses.  See Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102.  The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial.  See id.  A genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law.  Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325).  Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial.  Id.

**DISCUSSION**

**Defendants' Alleged Procedural Errors**

Preliminarily, the court addresses two purported procedural errors plaintiff raises in his opposition.

1    First, Nkwuo argues that all of defendants' declarations must be stricken because they were

2    not sworn before a notary public and therefore have no evidentiary value.  However, 28 U.S.C. §

3    1746 allows "the unsworn declaration, certificate, verification, or statement, in writing of such

4    person which is subscribed by him, as true under penalty of perjury . . .."  And, the Advisory

5    Committee Notes to the 2010 amendment to Fed. R. Civ. P. 56 state that "[a] formal affidavit is no

6    longer required."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment (citing 28

7    U.S.C. § 1746).  Plaintiff's request to strike defendants' declarations is denied.

8    Second, plaintiff argues that defendants' proof of service re their opening brief falsely

9    claims that the motion papers were served on September 4, when he says he did not actually

10   receive those papers until September 10.  However, when documents are served by U.S. mail (as

11   was the case here), then service is "complete upon mailing."  Fed. R. Civ. P. 5(b)(2)(C).  In reply,

12   defendants have submitted proof, including U.S. Postal records, that their motion papers were

13   mailed on September 4.  (Teeling Decl. ¶¶ 4-5, Exs. A & B).  Thus, their proof of service correctly

14   states that the motion papers were served on September 4, notwithstanding that Nkwuo did not

15   receive them until September 10.

16   **Disparate Impact**

17   As discussed, plaintiff's complaint references a claim for disparate impact.  Disparate

18   impact is a theory of discrimination that holds that policies or practices that are facially neutral or

19   that are not intended to discriminate, in fact, have a disproportionately adverse effect on members

20   of a protected class.  See generally Ricci v. DeStefano, 129 S. Ct. 2658, 2672 (2009); Guz v.

21   Bechtel Nat'l, Inc., 24 Cal.4th 317, 354 n.20 (2000).[6]  Defendants contend that plaintiff has not

22   alleged any facts supporting a disparate impact theory of discrimination.  Indeed, plaintiff does not

23   identify any neutral policy or practice, much less one that has a disproportionately discriminatory

24   impact on a protected group.  Nor has he presented any evidence of the same.  Defendants' motion

25   as to this claim is granted.

26   

27   [6] By contrast, disparate treatment refers to intentional discrimination based on prohibited grounds, such as race, color, and national origin.  See generally Ricci, 129 S. Ct. at 2672; Guz, 24 Cal.4th at

28   354 n.20.

United States District Court
Northern District of California

1

**Fraud**

2      To state a claim for fraud under California law, a plaintiff must allege:  (1) a

3  misrepresentation (false representation, concealment, or non-disclosure); (2) knowledge of falsity

4  (or scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5)

5  resulting damage.  Lazar v. Super. Ct., 12 Cal.4th 631, 638, 49 Cal. Rptr.2d 377, 909 P.2d 981

6  (1996).  Allegations of fraud must be stated with "specificity including an account of the 'time,

7  place, and specific content of the false representations as well as the identities of the parties to the

8  misrepresentations.'"  Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (quoting Edwards

9  v. Marin Park, Inc., 356 F.3d 1058, 1066 (9th Cir. 2004)); see also Fed. R. Civ. P. 9(b).

10  Defendants argue that, even liberally construed, nothing in plaintiff's complaint factually or

11  legally implies that a fraud claim has been alleged.  This court agrees.  Defendants' motion as to

12  this claim is granted.

13      **Discrimination Claim (Disparate Treatment)**[7]

14      Nkwuo does not identify whether he is asserting discrimination under federal or state law.

15  Either way, this court concludes that defendants are entitled to summary judgment on this claim.

16      Title VI of the Civil Rights Act provides, in relevant part:

17      No person in the United States shall, on the ground of race, color, or
        national origin, be excluded from participation in, be denied the benefits of,
18      or be subjected to discrimination under any program or activity receiving
        Federal financial assistance.

19
20  42 U.S.C. § 2000d.

21      Similarly, California's Unruh Act provides:

22      All persons within the jurisdiction of this state are free and equal, and no
        matter what their sex, race, color, religion, ancestry, national origin,
23      disability, medical condition, genetic information, marital status, or sexual
        orientation are entitled to the full and equal accommodations, advantages,
24      facilities, privileges, or services in all business establishments of every kind
        whatsoever.

25

26  _____

27  [7] In his opposition papers, plaintiff makes a vague reference to age discrimination and argues that
    defendants also violated California's Elder Abuse laws.  Plaintiff, however, has not pled sufficient
28  facts to support such claims or presented any evidence of the same.  And, in any event, no such
    claims are asserted in the complaint.

Cal. Civ. Code § 51(b).

The <u>McDonnell Douglas</u>[8] burden-shifting provisions apply to Title VI claims.  <u>Rashdan v. Geissberger</u>, 764 F.3d 1179, 1182 (9th Cir. 2014).  Thus, in order to establish a claim under Title VI, Nkwuo has the burden of establishing a prima facie case of discrimination.  If he succeeds in establishing a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for his dismissal from the program.  If defendants carry this burden, then Nkwuo must demonstrate that the legitimate reasons offered by defendants are not the true reasons for their actions, but merely are a pretext for discrimination.  <u>Id.</u>  The degree of proof necessary to establish a prima facie case is minimal and does not need to rise to the level of a preponderance of the evidence.  <u>Id.</u> at 1183.  "Evidence of discriminatory motive can be direct or indirect."  <u>Id.</u> "'Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'"  <u>Id.</u> (quoting <u>Vasquez v. Cnty. of Los Angeles</u>, 349 F.3d 634, 640 (9th Cir. 2003)).

"[A] summary judgment motion in an Unruh Act case is governed by the burden shifting provisions established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  <u>Trigueros v. Southwest Airlines</u>, No. 05-cv-02256-L(AJB), 2007 WL 2502151 at *3 (C.D. Cal., Aug. 30, 2007).

Here, defendants present declarations from University faculty, who aver that in making educational decisions about plaintiff, his race, color, and national origin were not considered. (Fouts Decl., ¶47; Rageh Decl., ¶41; Curtis Decl., ¶19; Fulkerth Decl., ¶22; Robbins Decl., ¶17; Hoppes Decl. ¶ 41).  Additionally, the declarants attest that they did not say anything disparaging of Africans, African-Americans, or Nigerians, or the cultures, customs, religious practices, ethnic traditions, or racial traditions of Africans, African-Americans or Nigerians, and did not say anything disparaging of persons of black color.  (Fouts Decl., ¶48; Rageh Decl., ¶44; Curtis Decl., ¶32; Fulkerth Decl., ¶38; Robbins Decl., ¶19; Hoppes Decl., ¶42).

Defendants also claim that African-American DBA Program students have successfully passed the qualifying exam at a high rate.  They say that beginning in the Spring 2010 semester,

---

[8] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

1    there have been a total of 41 first and second attempts to pass the exam by DBA Program students,

2    other than Nkwuo.  Of those 41 attempts, 33 attempts were successful, and eight attempts were

3    unsuccessful.  Of these 41 attempts, six were made by African-American DBA Program students

4    (other than plaintiff).  Of these six attempts, five were successful, and one was unsuccessful.

5    (Rageh Decl., ¶¶ 33-34, Ex. J).

6        Further, defendants say that no one involved in evaluating plaintiff was aware of his

7    political views or political voting; asked plaintiff about his political views or voting; responded to

8    any questions from plaintiff regarding any political views; discussed plaintiff's political views or

9    voting with him; asked plaintiff to discuss his political views or voting; or communicated with

10   plaintiff in any way regarding Plaintiff's political views or theirs.  (Fouts Decl., ¶46; Rageh Decl.,

11   ¶43; Curtis Decl., ¶31; Fulkerth Decl., ¶37; Robbins Decl., ¶18).

12       For his part, plaintiff has not presented any evidence---direct or indirect---of any

13   discrimination.  Indeed, defendants point out that, in deposition, plaintiff testified that no faculty

14   member ever mentioned his race.  (Vartain  Decl., Ex. O (Nkwuo Depo. 97:4-7; 152:3-7; 153:18-

15   154:5)).  Additionally, he testified that no professor ever inquired, nor did he ever mention, his

16   political beliefs or electoral preferences.  (Id. (Nkwuo Depo. 173:12-16; 173:25-176:23)).

17       Instead, plaintiff hypothesizes that, because the qualifying exams are graded based on

18   professors' academic judgment, the evaluation of his exam answers could not have been based on

19   anything other than discriminatory motives.  The only "evidence" plaintiff cites in support of this

20   theory:   In discovery he asked defendants for "all documents that define Golden Gate University

21   grading policy (a) GGU Agno [sic] School of Business Grading policy (b) GGU Graduate Grading

22   Policy (c) Doctoral Programs (Doctor of Business Administration) grading policy . . .."  (Opp. at

23   6:19-21).  Additionally, plaintiff says that he asked defendants "to define Golden Gate University

24   Doctoral Qualifying Exam Grading Criteria . . .."  (Id. at 6:23-25).  After noting that they objected

25   to his discovery requests, plaintiff says that defendants ultimately stated that they could find no

26   responsive documents.

27       The precise nature of plaintiff's discovery requests and defendants' objections and

28   responses is unclear.  But, even crediting plaintiff's characterization of his requests and

United States District Court
Northern District of California

15

United States District Court
Northern District of California

defendants' responses as true, and generously construing Nkwuo's opposition papers, at most plaintiff has shown that evaluation of qualifying exam responses is subjective and is not accomplished by, for example, comparing a student's answers to standardized or model responses. The fact that grading is subjective does not necessarily mean it is discriminatory.  Moreover, plaintiff has not refuted defendants' evidence that all exam responses, including his, were graded anonymously.  Without more, plaintiff has failed to present a prima facie case of discrimination.

Even if he had succeeded in establishing a prima facie case of discrimination, defendants have presented evidence that plaintiff was dismissed from the DBA Program for a legitimate reason:  Nkwuo was academically disqualified.  (Fouts Decl., ¶29; Rageh Decl., ¶ 32; Curtis Decl., ¶¶ 18, 29-30; Fulkerth Decl., ¶21, 26-29, 36; Robbins Decl., ¶¶ 16, 24-29, 36).  They have also presented evidence explaining that plaintiff was administratively withdrawn from Fouts' class because he failed to complete the mandatory first assignment.  (Fouts Decl., ¶¶ 33-42, Exs. L, M; Vartain Decl., Exs. O, P (Nkwuo Depo. 139:7-13; 143:11-16; 145:4-13; 147:8-24; 148:11-17; 162:10-23; 213:3-7; 213:25-214:12)).  And, as for Fouts' reported "verbal[] attack[]" on Nkwuo on the first day of class, plaintiff's own deposition testimony establishes that he *did* walk into class after it started (notwithstanding that he claims he originally arrived 30 minutes early).  (Vartain Decl., Ex. O (Nkuwo Depo. 150:12-17, 151:4-16)).  And, in any event, Nkwuo confirmed that Fouts said nothing about his race.  (Id. Ex. P (Nkwuo Depo. 152:3-7)).

Essentially, plaintiff believes that he passed the qualifying exam and that race discrimination is the only possible explanation for his failing grade.  To successfully oppose defendants' motion, however, plaintiff must produce evidence supporting his claims.  He cannot rest upon mere allegations or denials of defendants' evidence.  Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102.

On this record, this court concludes that plaintiff has failed to present any evidence raising a genuine issue of material fact as to discrimination under Title VI or the Unruh Act.  Defendants' motion for summary judgment as to this claim is granted.

**Harassment/Hostile Environment Claim**

To establish a hostile educational environment claim under Title VI, Nkwuo must show

that (1) there was a racially hostile environment; (2) the school had notice of the problem; and (3) the school failed to respond adequately to redress the racially hostile environment. <u>Monteiro v. Tempe Union High Sch. Dist.</u>, 158 F.3d 1022, 1033 (9th Cir. 1998).  A "racially hostile environment" is "one in which racial harassment is severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by the recipient." <u>Id.</u> (citation omitted).  The existence of a hostile educational environment presents a question of fact, determined by looking at the totality of the circumstances. <u>Id.</u>  "Racial harassment creates a hostile environment if it is sufficiently severe that it would interfere with the educational program of a reasonable person of the same age and race as the victim." <u>Id.</u>  "Moreover, racist attacks need not be directed at the complainant in order to create a hostile educational environment." <u>Id.</u>

Under California law, a plaintiff may bring a hostile environment claim under the Unruh Act and must show intentional discrimination in order to succeed.  <u>See</u> <u>Davison ex rel Sims v. Santa Barbara High Sch. Dist.</u>, 48 F. Supp.2d 1225, 1233 (C.D. Cal. 1998) (citing <u>Nicole M. by and through Jacqueline M. v. Martinez Unified Sch. Dist.</u>, 964 F. Supp. 1369, 1389 (N.D. Cal. 1997).

Here, faculty and staff involved in decisions regarding plaintiff aver that they have never said anything disparaging of Africans, African-Americans, or Nigerians generally, and did not make any offensive jokes, slurs, epithets, or engage in name-calling or physically threatening behavior toward plaintiff specifically.  (Fouts Decl., ¶¶ 48-49; Rageh Decl., ¶¶ 44-45; Curtis Decl., ¶¶ 32-33; Fulkerth Decl. ¶¶ 38-39; Robbins Decl., ¶¶ 19-20; Hoppes Decl., ¶¶ 42-43).  And, as discussed above, plaintiff testified that no faculty member ever mentioned his race.  (Vartain Decl., Ex. O (Nkwuo Depo. 97:4-7, 152:3-7, 153:18-154:5).  In his opposition, plaintiff simply cites the Webster's Dictionary definition of "harass," and says that his claim is "well plead."  (Opp. at 12:24-13:11).

Having reviewed the record, this court has found only a single reference to use of a slur.  As will be discussed, however, that one reference falls short of demonstrating a hostile environment; and, plaintiff apparently did not intend it to be the basis of this lawsuit.  In

United States District Court
Northern District of California

United States District Court
Northern District of California

1  deposition, Nkwuo testified about hearing people use the term "coffee" to refer to African-

2  Americans.  Although he said he heard that word used in that way perhaps five times while at the

3  University, he could not recall the circumstances (except one) and does not recall that any

4  professors used that term.  The one instance he remembered was as follows:   He was on the fourth

5  floor of the University where the DBA Program is located, in a public area of the building near the

6  elevators.  He overheard someone there say something like this:  "We had---we got a copy of his

7  resume, his resume looked good, but he's coffee."  However, plaintiff did not see the speaker's

8  face, did not know who the speaker was, and could not say for certain whether the speaker was a

9  student, a staff member, an administrator, a faculty member, a maintenance worker, or a visitor.

10  Other than that one instance, plaintiff could not recall any other occasion where he heard the term

11  "coffee" used to refer to African-Americans.  (Vartain Decl. Ex. O (Nkwuo Depo. 183:10-184:1,

12  184:17-21, 185:17-186:5, 186:16-24, 187:1-188:5)).

13       Plaintiff has not presented evidence creating a genuine issue of material fact that there was

14  a racially hostile environment at the University, much less one that was severe, pervasive or

15  persistent.  Defendants' motion for summary judgment as to this claim is granted.

16  **Fourth Amendment Claim**[9]

17       Plaintiff alleges that defendants violated his Fourth Amendment rights by conducting an

18  unlawful search and seizure of his computer records.  Defendants correctly point out that the

19  Fourth Amendment "proscrib[es] only governmental action; it is wholly inapplicable to a search or

20  seizure, even an unreasonable one, effected by a private individual not acting as an agent of the

21  Government or with the participation or knowledge of any governmental official."  United States

22  v. Jacobsen, 466 U.S. 109, 113 (1984) (citation omitted).

23       Nkwuo appears to concede that the "Fourth Amendment is a government action"; but, he

24  argues that "Golden Gate University receives, both the state and [sic] funding, but that does not

25  authorize the University to start executing government actions of blocking students' records and

26

27

28  _____

[9] In the body of his complaint, plaintiff also makes passing reference to an alleged violation of his Fifth Amendment rights.  However, the Fifth Amendment is not implicated because there is no state action.  Corrigan v. Buckley, 271 U.S. 323, 330 (1926).

denying access to s [sic] red [sic] doctoral research." (Opp. at 25:22-24). However, mere receipt of funds does not mean that the acts in question constitute state action. See generally Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982) (concluding that a private, non-profit school's receipt of public funds did not transform the decisions at issue into acts of the State). And, there is no indication whatsoever that the government had any part in the decisions concerning plaintiff.

Defendants' motion for summary judgment on this claim is granted.

**Contract Claims and Claim for "Abuse of Power and Authority"**

These claims are based on Nkwuo's contention that defendants acted arbitrarily, capriciously, and in bad faith with respect to him. His complaint alleges that defendants breached their contractual obligations and the covenant of good faith and fair dealing by giving him a failing grade on his qualifying exams (he says, for discriminatory reasons); by failing to provide him with proper guidance to ensure his success in the DBA Program; and by failing to properly investigate his administrative appeal. Additionally, in his opposition brief, plaintiff argues that defendants indiscriminately cancelled classes and qualifying exams, and "acted in bad faith by kicking Plaintiff out of class,"---all of which Nkwuo says caused him to waste additional time and money in the Program.

"There is a widely accepted rule of judicial non-intervention into the academic affairs of schools." Paulsen v. Golden Gate Univ., 25 Cal.3d 803, 808 (1979). "However, some courts, including those of California on occasion, have carved out an exception to this rule by permitting limited intervention whenever it is alleged that a university or college has acted arbitrarily or in bad faith." Id. "A university may not act maliciously by arbitrarily and capriciously dismissing or refusing to award a degree to a student on the ground of academic deficiencies if said student fulfills its degree requirements." Banks v. Dominican College, 35 Cal. App.4th 1545, 1552 (1995) (quotation and citations omitted). Nkwuo's burden of establishing arbitrary and capricious conduct, however, "is a heavy one." Id. He must show that his "dismissal was without any discernable rational basis." Id.

"Evidence that (a student) was treated radically different than others in a like situation" may be relevant to a claim that a university acted arbitrarily or in bad faith." Paulsen, 25 Cal.3d at

United States District Court
Northern District of California

19

809 (citation omitted).  "But such evidence is not conclusive of the issue.  The student must also

show that the difference in treatment in his case was the result of an arbitrary or bad faith decision

by the institution."  Id.  A university's decision may be overturned only if the court "find[s] it to

be arbitrary and capricious, not based upon academic criteria, and the result of irrelevant or

discriminatory factors."  Banks, 35 Cal. App.4th at 1551.  And, a court "must uphold the

university's decision 'unless it is such a substantial departure from accepted academic norms as to

demonstrate that the person or committee responsible did not actually exercise professional

judgment.'"  Id. (quoting Regents of University of Michigan v. Ewing, 474 U.S. 214, 225, 88

L.Ed.2d 523, 532, 106 S.Ct. 507 (1985)).

Here, Nkwuo has offered nothing more than conclusory allegations and arguments as to

these claims.  Such allegations and arguments are not evidence and do not create a triable issue of

material fact.  Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102.

Plaintiff has not identified any classes that were cancelled, much less presented any

evidence that any classes were cancelled arbitrarily, capriciously, or in bad faith.

With respect to the assertion that defendants unnecessarily cancelled qualifying exams, the

record presented reveals only one cancellation re the examination that was scheduled to take place

in October 2012.  As noted above, defendants' explanation for the cancellation---i.e., anonymity of

the grading process could not be ensured because Nkwuo was the only student who registered to

take that exam---is unrefuted.  (Fouts Decl. ¶¶ 31-32; Rageh Decl. ¶¶ 36-37).

Also unrefuted is defendants' reason for plaintiff's academic withdrawal from Professor

Fouts' class:   Plaintiff failed to complete the mandatory first assignment.  (Fouts Decl., ¶¶ 33-42,

Exs. L, M; Vartain Decl., Exs. O, P (Nkwuo Depo. 139:7-13, 143:11-16, 145:4-13, 147:8-24,

148:11-17, 162:10-23, 213:3-7, 213:25-214:12)).

With respect to the grading of his exam responses, Nkwuo maintains that defendants did so

without any academic criteria.  It is undisputed, however, that defendants gave plaintiff a

gratuitous third opportunity to take the qualifying exam.  And, defendants have presented evidence

demonstrating that Professors Fulkerth, Curtis, and Robbins evaluated plaintiff's exam responses

based on their academic judgment, as well as the criteria set out in the DBA Manual, and

20

concluded that his exam answers were deficient.  (Fouts Decl., ¶ 29; Rageh Decl., ¶ 28; Curtis Decl., ¶¶ 18, 23-27, 29; Fulkerth Decl., ¶¶ 26-34, 36; Robbins Decl., ¶¶ 16, 24-34, 36; Ex. A DBA Manual at 6).  As discussed, plaintiff has not presented any evidence even suggesting that his failing grades were due to discrimination or that his dismissal from the DBA Program was without any discernable rational basis.

Plaintiff maintains that defendants never discussed the reasons why he did not pass the qualifying exam.  In his opposition, plaintiff takes issue with the evaluating professors' statements that, while they do not recall the specific discussions they had with plaintiff about his exam responses, they also never "held back" information from him.  Nkwuo argues that these declarations are inherently contradictory and constitute "an Admission that the Defendants never discussed the reasons for Plaintiff Qualifying Exam Failures or Plaintiff Qualifying Exam Deficiencies . . . which is a violation of Golden Gate University Doctor of Business Admission procedure and policy."  (Opp. at 6:8-12).  However, as discussed, plaintiff himself testified that he met with the defendant professors a number of times and received feedback from them.  (Vartain Decl., Exs. O, P, (Nkwuo Depo. 72:9- 73:24, 111:19-25, 227:5-14, 238:20-23, 240:11-15, 240:22-241:2, 243:13-19, 279:13-280:14)).

As for his administrative appeal, plaintiff argues that defendants failed to follow proper procedure as set out in the University's grievance policy.  Here, Nkwuo argues:

> The grievance policy state [sic] that **"Within 10 calendar days of the date assigned to Review the matter, the Reviewer will afford the Grievant and the responsible Decision-maker an opportunity to present information and explanation in a business Meeting, but without the presence of attorneys."**  This implies that some form of Business meeting need [sic] to take place between the two parties without the presence of an Attorney.  *Cherron Hoppes did not conduct any such meeting and no such business Meeting took place between Plaintiff and Defendants either face to face physically in Conference room or virtually in cyberspace in **Violation of Golden Gate University Administrative Review Grievance Policy and Procedures***.

(Opp. at 7:16-23; see also Defts' MSJ, Ex. B at GGU0275-276).  However, defendants have presented evidence that Nkwuo was given an opportunity to present information and to discuss his grievance in a telephone conference with Hoppes.  (Hoppes Decl. ¶¶ 15-21).  Plaintiff has not pointed to any University policy that required the meeting to be conducted "between the two

1    parties" either "face to face physically" or "virtually in cyberspace."

2         Plaintiff has failed to raise a triable fact issue as to his contract claims or his claims for

3    alleged abuse of power and authority.  Defendants' motion for summary judgment as to these

4    claims is granted.

5         **Plagiarism, Theft, and Conversion Claims**

6         These claims are based on plaintiff's allegation that defendants used software he

7    developed, without permission, either for their own benefit or for the benefit of other students.

8         The basic elements of a conversion claim are "(1) the plaintiff's ownership or right to

9    possession of personal property; (2) the defendant's disposition of the property in a manner that is

10   inconsistent with the plaintiff's property rights; and (3) resulting damages."  Regent Alliance Ltd.

11   v. Rabizadeh, 231 Cal. App.4th 1177, 1181 (2014) (citation omitted).  To state a claim for

12   plagiarism, there must be some substantial similarity between the accused work and protectable

13   portions of the plaintiff's work.  Weitzenkorn v. Lesser, 40 Cal.2d 778, 791 (1953).

14        As discussed, defendants have presented declarations attesting that no defendant has used

15   any portion of any research or academic work conducted or produced by plaintiff for their own

16   personal gain, nor have they provided any such research or academic work to any third party for

17   any purpose.  (Fouts Decl., ¶50; Rageh Decl., ¶46; Curtis Decl., ¶35; Fulkerth Decl., ¶40; Robbins

18   Decl., ¶40; Hoppes Decl., ¶44).  Additionally, defendants point out that plaintiff testified that he

19   has no knowledge that the software has been accessed or used by any person at the University.

20   (Vartain Decl., Ex. O (Nkwuo Depo. 188:21-198:24)).  Plaintiff has presented no evidence to the

21   contrary.

22        In his opposition, plaintiff alleges that defendants conspired to drop him from the DBA

23   Program "because they felt threatened that a Black man was originating a pioneering breakthrough

24   research in the area of financial market forecasting using Artificial Neural Network methodology;

25   thus they conspired to kick Plaintiff out of the DBA program and [sic] so that they could convert

26   Plaintiff [sic] research to profit by having white man author the research."  (Opp. at 14:13-17).

27   However, he offers no evidence to support this theory, and mere allegations are not enough to

28   overcome a summary judgment motion.  Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102.

United States District Court
Northern District of California

22

1   Defendants' motion for summary judgment as to these claims is granted.

2   **Intentional Infliction of Emotional Distress**

3   A successful claim for intentional infliction of emotional distress requires "(1) extreme and

4   outrageous conduct by the defendant with the intention of causing, or reckless disregard of the

5   probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional

6   distress; and (3) actual and proximate causation of the emotional distress by the defendant's

7   outrageous conduct." Hughes v. Pair, 46 Cal.4th 1035, 1050 (2009) (citations omitted). "A

8   defendant's conduct is 'outrageous' when it is so extreme as to exceed all bounds of that usually

9   tolerated in a civilized community." Id. at 1050-51 (citation omitted). Liability, however, does

10  not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other

11  trivialities." Id. (citations omitted).

12  Plaintiff has not presented evidence giving rise to a genuine issue of material fact that any

13  defendant engaged in the extreme behavior required to establish a claim for intentional infliction

14  of emotional distress. All defendants aver that they have never harbored any ill will toward

15  Nkwuo and did not at any time intend to cause emotional distress. (Fouts Decl., ¶ 51; Rageh Decl.

16  ¶ 47; Curtis Decl. ¶ 36; Fulkerth Decl. ¶ 41; Robbins Decl. ¶ 41; Hoppes Decl. ¶ 45). And, as

17  discussed, defendants have presented unrefuted evidence that plaintiff was dismissed from the

18  program because he failed to achieve a passing grade on the mandatory qualifying exam. Plaintiff

19  has offered nothing (other than conjecture) that defendants did so out of intent to harm his

20  interests.

21  Defendants' motion for summary judgment on this claim is granted.

22  **ORDER**

23  Based on the foregoing, defendants' motion for summary judgment is GRANTED. All

24  previously scheduled deadlines and appearances are vacated. The Clerk shall enter judgment for

25

26

27

28

United States District Court
Northern District of California

1  defendants and close the file.

2         SO ORDERED.

3  Dated:   February 23, 2016

4

5                                                        _____

6                                                        HOWARD R. LLOYD
                                                         United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

24

5:14-cv-05192-HRL Notice has been electronically mailed to:

Michael Joseph Vartain     mike@vartainlaw.com, charissa@vartainlaw.com, emelina@vartainlaw.com, stacey@vartainlaw.com, william@vartainlaw.com

William Charles Teeling     william@vartainlaw.com, charissa@vartainlaw.com, emelina@vartainlaw.com

5:14-cv-05192-HRL Notice sent by U.S. Mail to:

John Nkwuo
P.O. Box 53554
San Jose, CA 95153